# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

STACY D.[1],

                                   Plaintiff,

        v.                                  No. 3:17-CV-1011(ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
DAVID L. BROWN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 7).

## I.   PROCEDURAL HISTORY

On May 19, 2014, plaintiff protectively filed[2] applications for Title II disability

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

insurance benefits ("DIB") and Title XVI supplemental security income ("SSI"),
alleging disability beginning on April 25, 2012. (Administrative Transcript ("T.") at
110-11, 191-97, 198-204).  Plaintiff alleged disability due to migraines, a stroke in
2009, left side paralysis and numbness, memory loss, hypertension, sleep apnea,
depression and anxiety, rapid heartbeat, enlarged liver, frequent falls, acid reflux,
asthma, frequent sinus infections, and allergies.  (T. 227).  Plaintiff's application was
initially denied on August 22, 2014.  (T. 110-115).  On July 25, 2016, plaintiff,
represented by counsel, testified at a hearing before Administrative Law Judge ("ALJ")
Elizabeth Koennecke.  (T. 69-86).  The ALJ issued a partially unfavorable decision on
September 8, 2016, finding that plaintiff became disabled on January 26, 2016, but not
before that date.  (T. 20-35).  The ALJ's decision became the Commissioner's final
decision when the Appeals Council denied plaintiff's request for review on July 5,
2017.  (T. 1-4).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, an adult plaintiff seeking disability insurance benefits
or SSI disability benefits must establish that he is "unable to engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment
which can be expected to result in death or which has lasted or can be expected to last
for a continuous period of not less than twelve months . . . ."  42 U.S.C. §
1382c(a)(3)(A).  In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial

support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. **FACTS**

Plaintiff, age 43 at the time of the hearing, lived with her 12 year-old daughter and her 16 year-old son (half the time) in an apartment above one occupied by plaintiff's parents. (T. 73). Plaintiff was working for Frontier Communications as a facilities assigner in 2009, when she suffered a stroke. (T. 73, 75). Plaintiff gained more than 100 pounds following her stroke, which made it hard to move, and limited her physical activity. (T. 74). After a year of rehabilitation, plaintiff had to return to work, in 2010, or lose her position. (T. 75). However, she left her job in April 2012, because of limits on use of her left hand following the stroke, and difficulties relearning her job and keeping up with new technology due to problems with focus, concentration, memory, and coping with stress. (T. 74-77, 84-85, 667). Plaintiff also testified that she was being treated by a neurologist for really bad migraine headaches, and that her last MRI revealed a "pseudo tumor" that caused a lot of problems. (T. 78). Plaintiff stated

5

that she required extensive assistance in activities of daily living because of, inter alia, dizziness, fatigue, occasional disorientation, stress, and panic attacks (T. 79-84); but at times she engaged in swimming and hiking for exercise (T. 375, 466, 502, 602).

Plaintiff's counsel has extensively outlined the facts in this case, including the medical and opinion evidence, and the testimony before ALJ. (Pl.'s Br. at 3-13, Dkt. No. 10). The ALJ's decision also included a lengthy discussion of the facts. (T. 23-26, 27-32). Rather than further reciting the evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   THE ALJ'S DECISION

As an initial matter, the ALJ noted that the plaintiff had filed two prior concurrent disability applications, which were denied in notices of initial determination dated March 12, 2013. The ALJ found that the plaintiff did not satisfy the conditions for reopening the prior unfavorable determinations, making those prior determinations final and binding. (T. 21). Plaintiff's counsel has not challenged the ALJ's ruling in this regard, and plaintiff is precluded, by the doctrine of res judicata, from establishing disability on or before March 12, 2013–the date through which plaintiff was found not disabled by the prior determination. *See Hussain v. Comm'r of Soc. Sec.*, No. 13 CIV. 3691, 2014 WL 4230585, at *10 (S.D.N.Y. Aug. 27, 2014), (Rep't-Rec.), *adopted*, 2014 WL 5089583 (S.D.N.Y. Sept. 25, 2014) (in general when a claimant takes no action to review a prior determination of the Commissioner, that decision becomes final and binding on the parties, and such a decision is administratively res judicata as to all matters decided therein); *Saxon v. Astrue*, 781 F. Supp. 2d 92, 99 (N.D.N.Y. 2011)

(given the failure of plaintiff's counsel to raise the limited exceptions permitting review of an ALJ's decision not to reopen a prior, unfavorable determination, res judicata precludes the court from reviewing the ALJ's decision ).

The ALJ found the plaintiff met the insured status requirements of the Social Security Act for DIB through December 31, 2017. (T. 23). At step one of the sequential disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 25, 2012, plaintiff's alleged onset date. (T. 23). At step two, the ALJ found that plaintiff's severe impairments were residuals of cerebral vascular accident, migraine headaches, and obesity, but found that other alleged impairments, including diabetes were not severe. (T. 23-24). The ALJ found at step three, that plaintiff's impairments, singularly or in combination, did not meet or equal any of the impairments listed at 20 C.F.R Part 404, Subpart P, Appendix 1. (T. 26-27).

Prior to proceeding to step four, the ALJ assessed plaintiff's residual functional capacity ("RFC"), and found that before January 26, 2016, plaintiff retained the RFC to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a). (T. 27). The ALJ determined that after January 26, 2016, plaintiff had an RFC of less than a full range of sedentary work, as she could lift/carry/push/pull ten pounds occasionally and less than ten pounds frequently; could stand and walk for two hours each total in an eight-hour workday; but could sit for only two hours in a

workday.  (T. 27).[3]  The ALJ also found that plaintiff was unable to operate a motor vehicle, but could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (T. 27).

At step four, the ALJ found that before January 26, 2016, plaintiff retained the residual functional capacity to perform her past relevant work as a telephone order clerk.  (T. 32-33).  The ALJ also found in the alternative, that even if plaintiff could not perform her past relevant work, she was able to perform other sedentary work existing in significant numbers in the economy, based on application of Medical-Vocational Rule 201.28.  (T. 33-34).  However, the ALJ also stated that, beginning on January 26, 2016, "[i]t is reasonable to conclude that . . . the claimant has lacked the sustained capacity required during the course of a forty-hour workweek to meet the quality, production, and attendance requirements of competitive remunerative work, significantly eroding the occupational base of jobs the claimant could perform at even the sedentary level of exertion and a finding of "disabled" is appropriate."  (T. 34).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following argument:

The ALJ's decision is unsupported by substantial evidence, as she erroneously determined Plaintiff's health significantly deteriorated beginning January 26, 2016.  As such, the ALJ's subsequent determinations are predicated on an arbitrary timeline that distorts and confuses the medical evidence of record.

(Pl.'s Br. at 1).

Defendant argues that substantial evidence supports the ALJ's determination that

---

[3] In making the determination that plaintiff could sit for only two hours during a workday, the ALJ gave significant weight to the May 2016 opinion of plaintiff's primary care physician, Dr. Ward, to that effect.  (T. 31, 32, 458).

plaintiff's impairments did not prevent her from engaging in substantial gainful activity before January 26, 2016. (Def.'s Br. at 2, Dkt. No. 11). This court concludes, for the reasons set forth below, that substantial medical opinion and other evidence does not support the ALJ's determination as to when plaintiff's condition worsened to the point that she was no longer had "the sustained capacity required during the course of a forty-hour workweek to meet the quality, production, and attendance requirements of competitive remunerative work." (T. 34). Accordingly, the case should be remanded so that the ALJ can obtain appropriate medical opinion evidence that would support a determination as to when, between March 12, 2013 and January 26, 2016, plaintiff's limitations worsened to the point that she became disabled.

## V. DETERMINATION OF ONSET DATE

The question of whether substantial evidence supports the ALJ's finding with respect to the date on which plaintiff no longer had the sustained capacity to perform her past work or other sedentary work requires analysis of the ALJ's development and review of the medical opinion and other evidence in reaching his RFC and disability determinations. The court will first briefly state the applicable legal standards relevant to that analysis.

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A

"regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

The full range of sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185, at *3. Jobs are sedentary if walking and standing are required occasionally and other sedentary

criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting capacity should generally total about six hours of an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3.

### 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, it must be given controlling weight when it is well-supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is not required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id*. An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making her determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include the plaintiff's RFC and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the

Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012)).

### 4. Duty to Develop the Record

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1512 (d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." *Dickson v. Astrue*, No. 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept.17, 2008).

In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination. 20 C.F.R. §§ 404.1512(e), 416.912(e).[4] Although the ALJ must attempt

---

[4] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. The current regulations apply to plaintiff's case.

to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999).

## B. Analysis

While the ALJ's opinion is not entirely clear, she appears to base her findings as to the onset date of plaintiff's disability on the perceived deterioration of her ability to meet "the quality, production, and attendance requirements of competitive remunerative work" (T. 34), and the worsening of plaintiff's capacity for sustained sitting during the workday (T. 27). Given the lack of evidence, before Dr. Ward's May 2016 opinion, that plaintiff's ability to sit for a sustained period was substantially limited, the more significant circumstance relevant to the date when plaintiff became disabled would be the erosion of her ability to perform work on a sustained basis because of the extent to which she would off-task or absent from work because of her migraine headaches and/or other impairments.

### 1. Plaintiff's Ability to Work on a Sustained Basis

As noted above, the ALJ found that, after January 26, 2016, the plaintiff's condition worsened to the point where she no longer had "the sustained capacity required during the course of a forty-hour workweek to meet the quality, production,

---

*See Jimenez v. Astrue*, No. 12 Civ. 3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that even though the regulations were amended to remove the provision requiring the ALJ to recontact a treating physician to resolve an ambiguity in the record, the regulations still "contemplate the ALJ recontacting the treating physicians when 'the additional information needed is directly related to that source's medical opinion'").

and attendance requirements of competitive remunerative work." (T. 34). In support of this finding, the ALJ stated that "[t]reatment notes clearly show an exacerbation of [plaintiff's] symptoms and reporting beginning on January 26, 2016. . . ." (T. 30). On that date, plaintiff was seen for a "new-onset of diabetes" and, according to the ALJ, reported symptoms including "fatigue, chronic pain, and difficulty engaging in activities on a sustained basis." (T. 30, 552-57). As discussed more below, the ALJ noted that, in February 2016, plaintiff began receiving assistance from NY Connects with daily activities and household chores. (T. 30-31, 271-72, 521). The ALJ also referenced a July 2016 appointment with Dr. Ward where plaintiff reported "worsening memory, increasing joint pain and body weight, and additional treatment for a new condition of diabetes." (T. 31, 489-95).

The ALJ's description of Dr. Ward's observations on January 26 and July 6, 2016 are not entirely accurate. Dr. Ward's treatment notes on January 26th indicate that plaintiff complained of fatigue, but there was no mention of chronic pain or difficulty engaging in activities on a sustained basis. (T. 30, 552-57). In fact, Dr. Ward found that, on January 26th, plaintiff was "amazingly asymptomatic," and could be treated for her diabetes on an outpatient basis. (T. 555). In any event, as plaintiff's counsel documents, the medical evidence shows numerous examples of plaintiff's complaints of fatigue and pain well before January 2016. (Pl.'s Br. at 15-16). Dr. Ward's July 2016 treatment notes do not state that plaintiff had "increasing" body weight on that date, and plaintiff's prior weight was similar or exceed her weight in July 2016. (T. 579 (261 lbs. on 4/7/15); T. 573 (267 lbs. on 6/25/15); 566 (279 lbs. on 12/15); 554 (258 lbs. on

1/26/16); 505 (265 lbs. on 4/6/16); 492 (261 lbs. on 7/16/16)).

As plaintiff's counsel points out, it is incongruous that the ALJ relied on plaintiff's diabetes symptoms as a basis for concluding that she first became disabled in January 2016. (Pl.'s Br. at 15). The ALJ found, as of September 8, 2016, that plaintiff's diabetes was not severe, i.e., that it did not impose more than a slight limitation of plaintiff's ability to perform basic work activities. (T. 23, 24). The ALJ based that finding on Dr. Ward's opinion that plaintiff's diabetes had been controlled by medication and was not a reason for her disability, as of May 2016. (T. 24, 457). In fact, Dr. Ward noted that plaintiff's new-onset diabetes was managed by diet and medication starting in early February 2016, through the last evaluation of record in July 2016. (T. 489, 502, 508, 521).

Plaintiff's medical records reflect some fluctuations in plaintiff's problems with memory before January 2016[5], as might be expected of persons with a history of migraine headaches.[6] Dr. Ward reported in January 2016 that plaintiff's memory "is never good, as evidenced by [her neurologist's] last note" (T. 549 (1/27/16)), and that plaintiff's "[m]emory is impaired, [but] no more than usual." (T. 543 (1/28/2016)).

---

[5] Compare, e.g., T. 445 (Dr. Ransom's single evaluation on 8/14/2014 revealed "no sign of memory deficits); 47 (plaintiff advised neurologist on 2/5/15 that her memory has gotten "particularly worse with headaches"); 56, 58 (neurologist noted, on 9/24/15, that plaintiff's memory is improved with medication change, but memory problems are still present).

[6] *See e.g, Kelsey O. v. Comm'r of Soc. Sec.*, No. 3:17-CV-525 (ATB), 2018 WL 3193197, at *5 (N.D.N.Y. June 28, 2018) ("The ALJ's reliance on isolated treatment notes showing that plaintiff was not experiencing headaches at the time of the examination fails to recognize the episodic nature of the impairment."); *Groff v. Comm'r of Soc. Sec.*, No. 7:05-CV-54 (NAM), 2008 WL 4104689, at *8 (N.D.N.Y. Sept. 3, 2008) ("[Migraine ] [s]ymptoms usually follow a pattern in each patient. . . . The patient may have attacks daily or only once every several months") (citing The Merck Manual 1376 (17th ed.1999)).

The ALJ also found that "the medical opinions in the record beginning on January 26, 2016 are consistent with [plaintiff's] allegations of disabling work-related functional limitations." (T. 31). The May 2016 opinion of Dr. Ward that plaintiff could not meet the sustained sitting and other exertional requirements for sedentary work is discussed below. (T. 31, 457-59). The ALJ also discussed the April 2016 opinion of treating neurologist, Dr. Mongiovi, who found, inter alia, that plaintiff would have "a wide range of limitations based primarily on headaches, . . . significant problems with concentration, memory, and mental processing speed, a need for frequent rest breaks and absences from work, . . . [and] significant limitations dealing with stress, performing at a consistent pace, responding to changes in a routine work setting, and staying on task." (T. 31, 32, 690-95). The ALJ observed that Dr. Mongiovi did not assign any specific onset date for the limitations he found. (T. 31). While the ALJ found that certain aspects of Dr. Mongiovi's opinion "are generally inconsistent with the balance of the evidence, both before and after January 26, 2016[,]"[7] he noted that this treating neurologist issued his very-limiting medical source statement after the onset date determined by the ALJ. (T. 32). It seems clear that Dr. Mongiovi's opinion that plaintiff would be frequently off-task and absent from work as a result of various limitations is the primary support for the ALJ's opinion that, after January 26, 2016, plaintiff lacked the sustained capacity to meet the quality, production, and attendance

---

[7] The ALJ perceived a contemporaneous inconsistency between Dr. Mongiovi's opinion that plaintiff's limitations were "based primarily on headaches" and the neurologist's statements that plaintiff's headaches only occurred once per week, and that medication had reduced the duration of her migraines from three to four days to less than one day, and reduced her pressure headaches. (T. 32, 691-92).

requirements of competitive work during a 40-hour workweek.[8]

The ALJ explained why he gave reduced weight to Dr. Mongiovi's opinions with respect to the period before January 26, 2016. He found that Dr. Mongiovi's mental work-related functional limitations "were entirely inconsistent with the well-supported opinions of psychologists Dr. Ransom and Dr. Reddy." (T. 32). Consulting examining psychologist, Dr. Ransom, opined, inter alia, that plaintiff had no difficulties maintaining concentration, persistence, and pace and that there were no signs that plaintiff had memory deficits during her evaluation. (T. 24-25, 26, 444-45). Non-examining psychologist, Dr. Reddy, based on his review of the then-available medical records, found that plaintiff's mental impairments did not cause more than minimal limitations in her ability to perform basic mental work activities. (T. 25, 92-93). However, Dr. Ransom and Dr. Reddy prepared their reports in August 2014, and the ALJ had no opinion evidence upon which to rely with respect to plaintiff's mental work-related functional limitations until Dr. Mongiovi's April 2016 medical source statement. Nonetheless, the ALJ did not request that Dr. Mongiovi specify an onset date, in or before April 2016, for plaintiff's perceived limitations. *See, e.g., Haggerty v. Comm'r of Soc. Sec.*, No. 3:10-CV-306 (GLS/ATB), 2011 WL 841443, at *9 (N.D.N.Y. Feb. 14, 2011) ("[t]he failure to re-contact [plaintiff's treating neurologist] to solicit his opinion on plaintiff's ability to work and the continuing impact of medication on

---

[8] Dr. Ward's May 2016 Medical Source Statement reported limitations in plaintiff's ability to perform the exertional requirements for sedentary work, but left blank the place on the form which asked the doctor to "describe any other limitations (such as psychological limitations, sensory limitations . . .) that would affect your patient's ability to work at a regular job on a sustained basis." (T. 458-59).

17

plaintiff's headaches constitutes a breach of the ALJ's duty to develop the record, and also warrants a remand") (Rep't-Rec.), *adopted* 2011 WL 841288 (N.D.N.Y. Mar. 8, 2011). The ALJ, instead, relied on his own evaluation of the medical records to determine when plaintiff's ability to work at a competitive, remunerative job on a sustained basis worsened to the point that she became disabled. *See, e.g., Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings."); *Felder v. Astrue*, 10-CV-5747, 2012 WL 3993594, at *11-13 (E.D.N.Y. Sept. 11, 2012) ("an ALJ who makes an RFC determination in the absence of a supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error").

In finding that the plaintiff was not disabled prior to January 26, 2016, the ALJ noted twice that "the medical evidence prior to [that date] . . . shows a good response to conservative treatment modalities and a capability to engage in a wide range of activities of daily living." (T. 31, 32). However, "to place such emphasis on the absence of 'any specific evaluation or treatment' is . . . a misreckoning of the elusive task a doctor faces in diagnosing this impairment[–migraines] . . . ). *Groff v. Comm'r of Soc. Sec.*, 2008 WL 4104689, at *7. To the extent the ALJ relied on plaintiff's activities of daily living as evidence of her ability to work on a sustained basis despite a history of fluctuating migraine headache symptoms, such evidence provides little, if

any, support for his finding.[9]   The ALJ also observed that "the objective medical evidence prior to January 26, 2016 is generally unremarkable[,]" referencing, inter alia, a May 2012 ambulatory EEG within normal limits.  (T. 30, 305-06).  However, "[t]he ALJ's reliance on diagnostic imaging results [in connection with his RFC analysis] fails to recognize that migraine headaches do not stem from a physical or chemical abnormality which can be detected by imaging techniques or laboratory tests." *Tanner v. Comm'r of Soc. Sec.*, No. 5:15-CV-577 (TJM/ATB), 2016 WL 3189754, at *7 (N.D.N.Y. May 11, 2016), (Rep't- Rec.), *adopted*, 2016 WL 3190227 (N.D.N.Y. June 7, 2016).[10]

The ALJ's conclusion that plaintiff's functional limitations first worsened to the point that she became disabled in January 2016, is not consistent with the medical evidence documenting that plaintiff's symptoms and limitations, particularly those relating to her migraine headaches, fluctuated between 2013 and 2016.  In August 2013, Dr. Ward reported that plaintiff had increased headaches after passing out and

---

[9] *See, e.g. Mallery v. Berryhill*, No. 3:17-CV-587 (DEP), 2018 WL 1033284, at *4 (N.D.N.Y. Feb. 22, 2018) (remanding where ALJ relied solely on plaintiff's daily activities to discount treating physician's opinions that migraines would force plaintiff to be off-task a significant portion of the workday); *Kelsey O. v. Comm'r of Soc. Sec.*, 2018 WL 3193197, at *6 (plaintiff's ability to perform certain activities outside the house is a very weak basis for the ALJ's rejection of the treating source opinion, because all of the activities described were performed at a rate other than eight hours a day, five days a week).

[10] *See also Groff v. Comm'r of Soc. Sec.*, 2008 WL 4104689, at *7 (". . . there exists no objective clinical test which can corroborate the existence of migraines"); *Sech v. Comm'r of Soc. Sec.*, No. 7:13-CV-1356 (GLS), 2015 WL 1447125, at *3 (N.D.N.Y. Mar. 30, 2015) ("'[b]ecause there is no test for migraine headaches, when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating [the claimed disorder], the Secretary cannot rely on the ALJ's rejection of the claimant's testimony [at Step Two] based on the mere absence of objective evidence'") (citation omitted) .

being hospitalized a few weeks before (T. 657), and in October 2013, Dr. Ward reported that plaintiff was experiencing fibromyalgia-type pain (T. 393, 396). In October 2013, plaintiff's neurologist at Strong Memorial Hospital ("Strong") reported that plaintiff had chronic daily headaches; poor energy; somewhat worsening cognitive impairment caused in part by medication side effects; memory changes and confusion; left-sided numbness, tingling, and weakness; and loss of balance. (T. 356-57, 361-62). The neurologist noted that a prior MRI from 2012 did not reveal signs of any source, including "pseudotumor cerebri to explain the patient's persistent treatment refractory, daily headaches." (T. 361).

As noted earlier, the medical consultants, Dr. Ransom and Dr. Reddy, found that plaintiff had less severe symptoms in August 2014, although neither had an ongoing treatment relationship with plaintiff. In September 2014, plaintiff's neurologist at Strong found that plaintiff's migraines had improved since her last visit, after her medications were adjusted. (T. 42).

In February 2015, plaintiff's neurologist at Strong found that, since the prior September, plaintiff had worsening headaches with new visual features and dizziness; stumbles due to left-leg drag; and worsening memory. The neurologist ordered an MRI "to evaluate for intercranial process contributing to new features developed." (T. 47, 49-50, 52). The MRI revealed a partial empty sella and pseudotumor,[11] and plaintiff

---

[11] "Empty sella syndrome is a rare disorder characterized by enlargement or malformation of a structure in the skull known as the sella turcica. The sella turcica is a saddle-shaped depression located in the bone at the base of skull (sphenoid bone), in which resides the pituitary gland. In empty sella syndrome, the sella turcica is either partially filled with cerebrospinal fluid and a very small associated pituitary gland lying in the floor of the sella (partially empty sella) or

required a lumbar puncture to draw spinal fluid to decrease cerebrospinal pressure. (T. 52, 53, 570, 576). While the ALJ acknowledged that plaintiff mentioned the diagnosis of a pseudotumor during her hearing testimony (T. 28, 78), the ALJ did not discuss this February 2015 diagnosis or the invasive treatment–a lumbar puncture–that followed.[12] This medical evidence appears to contradict the ALJ's statements that plaintiff's symptoms and limitations worsened starting on January 26, 2016, and that "the medical evidence prior to [that date] . . . shows a good response to conservative treatment modalities . . . ." (T. 31, 32).[13]

In September 2015, plaintiff's neurologist at Strong again observed some improvement in her migraine headaches, with new medication. Plaintiff's memory improved, perhaps because of the medication change, but it was "still not where she would like it to be." Plaintiff also still experienced some dizziness. (T. 56, 58). On the January 26, 2016 onset date selected by the ALJ, Dr. Ward reported that, notwithstanding plaintiff's new onset of plaintiff's diabetes, her headaches had

completely filled with cerebrospinal fluid with no visualized pituitary gland (completely empty sella). . . . Empty sella syndrome may occur as a primary disorder, for which the cause is unknown (idiopathic), or as a secondary disorder, in which it occurs due to [inter alia.] a condition known as idiopathic intracranial hypertension (also called pseudotumor cerebri) during which elevated intracranial pressure causes empty sella syndrome."
https://rarediseases.org/rare-diseases/empty-sella-syndrome/

[12] As noted above, while an ALJ is not required to explicitly analyze every piece of conflicting evidence in the record, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d at 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, 2010 WL 5072112, at *6.

[13] As noted above, Dr. Mongiovi stated that medication helped with plaintiff's pressure headaches in April 2016 (T. 692), although that observation was made three months after the onset date determined by the ALJ.

improved.  (T. 552).

In sum, the ALJ's selection of the date of January 26, 2016 as the date that plaintiff's functional limitations worsened to the point that she could no longer perform her past work or other sedentary work on a sustained basis was not supported by substantial evidence.  On remand, the ALJ should consider requesting plaintiff's treating neurologist to provide an onset date for plaintiff's inability to stay on task and meet the attendance requirements of competitive work based on medical evidence.  In the alternative the ALJ may consider having a medical expert, with access to the medical records after 2014, suggest a disability-onset date that is based on the complete medical evidence of record.

## 2.    Plaintiff's Capacity for Sitting During the Workday

In finding that plaintiff could only sit for two hours during a workday after January 26, 2016, the ALJ gave "significant weight" to the May 4, 2016 opinion to that effect from plaintiff's primary care physician, Dr. Ward, who did not specify a specific onset date for the sitting or other limitations.  (T. 31, 32, 458).[14]  The ALJ also noted that, as of February 2016, plaintiff started receiving assistance from NY Connects with respect to activities of daily living and household chores.  (T. 30-31).  Brittany Jackson of that organization prepared a third-party statement reporting that, as of February 2016, plaintiff had difficulty walking, balancing, and handling objects, as well as

---

[14] The ALJ acknowledged that plaintiff's neurologist, Dr. Mongiovi, opined, on April 28, 2016, that plaintiff could sit for six hours in an eight-hour workday, but gave that opinion "reduced weight" because it was inconsistent with the evidence before and after January 26, 2016.  (T. 31, 32).

cognitive problems, which resulted in plaintiff's need for such outside assistance, and made the prospects for plaintiff's employment unlikely. (T. 29, 271-72).[15]

The ALJ gave reduced weight to Dr. Ward's opinions regarding plaintiffs sitting and other limitations prior to January 26, 2016 "because they are inconsistent with the medical evidence prior to January 26, 2016, which shows a good response to conservative treatment modalities and a capability to engage in a wide range of activities of daily living . . . ." (T. 32). The ALJ gave "significant weight" to some aspects of the August 2014 opinion of consulting examiner, Dr. Figueroa, for the time period before January 26, 2016, including the absence of any finding that plaintiff was limited with respect to sitting, handling, fingering, or feeling. (T. 30, 31-32, 448-453).[16] The ALJ noted that, in October 2013 and April 2015, Dr. Ward encouraged plaintiff to increase, not decrease her physical activity to address her obesity (T. 30, 396, 576), and noted that plaintiff reported swimming with no problems and doing exercise videos in May 2014 (T. 30, 375). The ALJ found that plaintiff had only mild restrictions on the activities of daily living, although she required assistance from family in some household activities, and was limited by dizziness, a propensity for falls, and left-side weakness and lack of sensitivity. (T. 25).

---

[15] The ALJ gave Ms. Jackson's statement, as well as the statements from plaintiff's family members, little weight with respect to plaintiff's functioning before January 26, 2016, but apparently gave Ms. Jackson's observations some weight with respect to plaintiff's limitations after that date. (T. 32)

[16] Non-examining psychologist, Dr. Reddy reviewed available medical records and opined, on August 14, 2014, that plaintiff could sit for about six hours in a workday and otherwise had the capacity to perform light work. (T. 94-96). The ALJ gave "great weight" to Dr. Reddy's opinions, but appeared to focus on the psychologist's findings regarding plaintiff's mental functioning. (T. 31).

Prior to Dr. Ward's medical source statement in May 2016, there is little, if any, indication in the record that plaintiff could not sit for six hours during an eight-hour period. Even during the July 2016 hearing, the plaintiff did not identify limitations involving sitting as a reason that she could not continue with her prior work. (T. 75-77, 84-86, 667). However, the ALJ provides no basis, in the medical opinion evidence, for choosing the seemingly arbitrary date of January 26, 2016 as the point at which plaintiff was no longer able to meet the sustained sitting requirements for the full range of sedentary work.[17] While plaintiff started receiving outside assistance in activities of daily living ("ADLs") starting in February 2016 from NY Connects, she had, since her stroke in 2009, relied on such assistance from her family. Moreover, the various ADLs discussed by the ALJ were not reflective of plaintiff's abilities for sustained sitting.[18] On remand, if the ALJ is to provide a date by which plaintiff lost her ability to meet the

---

[17] *See, e.g., Bathrick v. Astrue*, 3:11-CV-101, 2012 WL 1069180, at *4-5 (D. Conn. Mar. 9, 2012) (directing the ALJ, on remand, to obtain the necessary medical opinions regarding Bathrick's physical limitations, including her abilities to perform the tasks required by medium level jobs; "[i]f [the] treating physician is unable to provide the necessary evidence, the ALJ shall then attempt to obtain the evidence through other channels[,]" such as . . . "an opinion from a medical expert.")) (Rep't-Rec.), *approved in relevant part*, 2012 WL 1068985, at *4-5 (D. Conn. Mar. 29, 2012); *Cohen v. Astrue*, 07 Civ. 535, 2011 WL 2565659, at *1 (S.D.N.Y. May 17, 2011) (the Appeals Council remanded the case back to the ALJ because his RFC findings were not supported by specific medical opinion evidence, and directed that the ALJ obtain testimony from a medical expert).

[18] *See,e.g., Stoesser v. Comm'r of Soc. Sec.*, No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *6-7 (N.D.N.Y. Jan. 19, 2011) (claimant's daily activities–including cleaning the house, watching television and playing video games, cooking simple meals, and shopping for groceries–did not support the ALJ's finding that plaintiff could perform sedentary work over an eight-hour workday) (Rep't-Rec.), *adopted*, 2011 WL 381941 (N.D.N.Y. Feb. 3, 2011); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (the ALJ erred when he concluded that plaintiff could meet the sitting requirements of sedentary work because she cooked and shopped for herself, used public transportation, and managed to remain seated for one long plane ride).

exertional requirements for sedentary work, she should ask Dr. Ward to provide an onset date for plaintiff's reported limitations for sitting, lifting, and carrying. In the alternative, the ALJ should ask a medical expert to review the medical evidence, including treatment records after 2014, and suggest an onset date that is supported by medical evidence.[19] *See, e.g., Schmelzle v. Colvin*, No. 6:12-CV-1159 (GLS/ATB), 2013 WL 3327975, at *8, 14 (N.D.N.Y. July 2, 2013) (recommending, on remand, that the ALJ consider securing the testimony of a medical expert to assist in properly analyzing all of the medical opinion and other evidence in order to properly determine

---

[19] In the absence of contrary claims by plaintiff, the ALJ's finding that plaintiff could meet the sustained sitting required for sedentary work may well be supported by substantial evidence, including the opinion of Dr. Figueroa, at least through the time of Dr. Figueroa's opinion in 2014. *See, e.g. Schmitt v. Commissioner of Social Sec.*, 5:11-CV-796 (LEK/ATB), 2012 WL 4853506, at *9 (N.D.N.Y. July 24, 2012) (in relying on the opinion of a consulting examiner that the plaintiff, inter alia, had no gross limitation sitting, standing, or walking, the ALJ made an appropriate function-by-function RFC supported by substantial evidence) (Rep't-Rec.), *approved*, 2012 WL 4853067 (N.D.N.Y. Oct 11, 2012); *Heburn v. Astrue*, 6:05-CV-1429 (LEK/DEP), 2009 WL 174941, at *8 (N.D.N.Y. Jan. 23, 2009) (the ALJ's RFC determination draws support from the findings of a consulting examiner who, notwithstanding his diagnoses that plaintiff suffers from fibromyalgia, nonetheless opined that plaintiff has only a mild degree of limitation in lifting, carrying, pushing, and pulling, with no gross limitation noted in sitting, standing, walking, climbing, or bending). *Cf. DiVetro v. Commissioner of Social Sec.*, No. 5:05-CV-830 (GLS/DEP), 2008 WL 3930032, at *12 (N.D.N.Y. Aug. 21, 2008) (consulting examiner's opinion that plaintiff has no "gross limitation" in her ability to sit does not supporting the ALJ's finding that plaintiff could sit for eight hours in a given workday). The evidentiary support for the ALJ's conclusion that plaintiff could perform the lifting and carrying requirements for the full range of sedentary work, before and after January 26, 2016, would seem a closer call. Dr. Figueroa opined, in 2014, that plaintiff had "moderate limitations for . . . lifting and carrying due to her left arm residual weakness from the stroke." (T. 452). Dr. Ward found, in May 2016, that plaintiff could only rarely lift even ten pounds or less. (T. 458). *See Kelsey O. v. Comm'r of Soc. Sec.*, 2018 WL 3193197, at *6 ("the ALJ did not have substantial evidence at the time of her opinion to support her determination that plaintiff had no limitations with regard to lifting and carrying [and] improperly substituted her lay opinion for the findings of plaintiff's treating physician"). On remand, the ALJ should develop and reevaluate the medical evidence to provide a basis for concluding when, if at all, after March 12, 2013, plaintiff could meet the lifting and carrying standards for her past work or for other sedentary work.

plaintiff's RFC during the relevant closed period).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper determination, based on medical opinion and other evidence, of when, between March 12, 2013 and January 26, 2016, plaintiff's symptoms and limitations worsened to the point that (1) she was no longer had the sustained capacity required during the course of a forty-hour workweek to meet the quality, production, and attendance requirements of competitive remunerative work;  and/or (2) she could no longer  meet the sustained sitting and other exertional requirements of her prior work or other sedentary work.

Dated:  February 1, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge